UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CYNTHIA L. CHRISTIAN,<br>    Plaintiff,<br><br>v.<br><br>MICHAEL ASTRUE,<br>Commissioner of Social Security,<br>    Defendant. | )<br>)<br>)    Civil Action No. 3:10-cv-0455<br>)    Judge Nixon/Brown<br>)<br>)<br>)<br>) |

To: The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI), as provided under Title XVI of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Response. (Docket Entries 14, 18). Plaintiff also filed a Reply. (Docket Entry 21). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 12). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

## I. INTRODUCTION

Plaintiff first filed for Social Security Income ("SSI") on May 21, 2007, with an alleged onset date of December 1, 1980. (Tr. 118-23). Plaintiff's claim was denied initially and on reconsideration. (Tr. 52-53, 54-55). She requested a hearing before the ALJ, which was held on September 3, 2009 before ALJ John R. Daughtry. (Tr. 62, 24-51). The ALJ issued an

unfavorable decision on September 30, 2009. (Tr. 9-23).

In his decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since May 21, 2007, the application date (20 CFR 416.971 *et seq.*).
2. The claimant has the following severe impairments: affective disorder (bipolar disorder), anxiety disorder, and substance abuse disorder (20 CFR 416.920(c)).
3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels which includes no limitations in the ability to lift, carry, stand, walk, sit, climb, balance, kneel crouch, crawl, stoop, push, pull, reach; but with the following non-exertional limitations; can understand, remember, and carry out simple and detailed 3 step instructions; can maintain concentration and persistence necessary to perform simple and detailed 3 step tasks; should have no contact with the general public; can relate to coworkers on an occasional basis; may require occasional direct supervision; and can adapt to infrequent changes in the workplace.
5. The claimant is unable to perform any past relevant work (20 CFR 416.965).
6. Born on October 16, 1961, the claimant was 45 years old on the date the application was filed on May 21, 2007, which is defined as a younger individual age 45-49 (20 CFR 416.963).
7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).
8. Transferability of job skills is not material to the determination of disability using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).
10. The claimant has not been under a disability, as defined in the Social Security Act, since May 21, 2007, the date the application was filed (20 CFR 416.920(g)).

(Tr. 14-22).

The Appeals Council denied Plaintiff's request for review on March 10, 2010. (Tr. 1-4).

## II. REVIEW OF THE RECORD

Plaintiff was born on October 16, 1961. (Tr. 118). She applied for SSI on May 21, 2007,

alleging she was disabled since December 1, 1980 as a result of bipolar disorder and anxiety disorder. (Tr. 140). Plaintiff has not worked since 2002 and has past employment experience as a telephone solicitor. (Tr. 128, 132). Plaintiff was previously awarded benefits in July 2003, but the benefits were discontinued because she was incarcerated for burglary. (Tr. 42). She was released in March 2007. (Tr. 19). Plaintiff resides with her mother in her childhood home. (Tr. 36).

On July 5, 2004, Plaintiff was admitted to the Middle Tennessee Mental Health Institute ("MTMHI") after her boyfriend and mother reported she had suicidal ideation and had overdosed on Soma. (Tr. 186, 191, 215). Plaintiff denied any suicidal ideation. (Tr. 187). She received a Clinically Related Group ("CRG") assessment on July 5, 2004. She was assessed as having moderate limitations in activities of daily living; extreme limitations in interpersonal functioning; marked limitations in concentration, task performance, and pace; and marked limitations in adapting to change. (Tr. 209-10). The rater categorized Plaintiff in Group 1, meaning she suffers from a severe and persistent mental illness, and her Global Assessment of Functioning ("GAF") was assessed at 22.[1] (Tr. 211). She was discharged on July 7, 2004. (Tr. 186).

---

[1] The Global Assessment of Functioning test is a
subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.

Plaintiff had an intake assessment at Mental Health Cooperative on September 13, 2004. The crisis assessment was recommended because Plaintiff had expressed suicidal ideation. (Tr. 216). The case provider, Amanda Myatt, stated that Plaintiff has a history of being diagnosed with attention-deficit disorder and bipolar disorder. *Id*. Plaintiff did not pursue follow-up care following her hospitalization in July 2004. *Id.* Plaintiff acknowledged using crack and crank with the last use more than 2 months prior to the assessment. *Id.* She was using Methadone and Xanax as prescribed. *Id.* Ms. Myatt recommended Plaintiff be referred for further care. *Id*. A progress note from the same date, prepared by Sherrill Green, noted Plaintiff admitted to a history of cocaine abuse, although she had not used any drugs in 2 months. (Tr. 217). Ms. Green noted she denied any suicidal or homicidal ideation. *Id*.

On December 8, 2004, Plaintiff was treated by Dr. Kevin Collen at Mental Health Cooperative. (Tr. 213-14). Dr. Collen noted Plaintiff had been taking Methadone for the past 4-5 years for chronic back pain from degenerative joint disease. (Tr. 213). He stated that her moods have been more stable since she began taking Zyprexa. Plaintiff reported having a history of vague visual and auditory hallucinations. *Id*. Plaintiff reported she had a history of rape less than 10 years prior, but she denied thoughts of self or other harm. *Id*. She stated she accidentally took too many Soma when she was admitted to MTMHI for attempted suicide. (Tr. 214). Dr. Collen noted Plaintiff had a history of substance use; she had used cocaine four months prior to the appointment but had no abuse pattern of use, but she had a history of abuse of alcohol and cannabis, with her last alcohol use two years prior and last cannabis use four years prior. *Id*.

---

*Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich.2005).

4

Plaintiff had a follow-up appointment with Dr. Collen on January 5, 2005. (Tr. 220-21). Dr. Collen noted Plaintiff had been taking her medication as described and that her sleep and appetite had improved. (Tr. 220). She reported no auditory or visual hallucinations or thoughts of self or other harm. *Id.* A follow-up appointment on February 1, 2005 reflected similar results, with Plaintiff feeling like the medication was helping, with no current anxiety symptoms. (Tr. 222-23).

Plaintiff saw Dr. Collen again on March 1, 2005. Plaintiff reported she was very anxious and was not sleeping well. (Tr. 225-26). Dr. Collen decreased Plaintiff's Xanax dose from four times per day to three times per day, and Plaintiff noted her mood would be worse. (Tr. 225).

A second CRG assessment was performed on April 4, 2005. (Tr. 206-08). Plaintiff was determined to have moderate limitations in activities of daily living; extreme limitations in interpersonal functioning; mild limitations in concentration, task performance, and pace; and marked limitations in adapting to change. (Tr. 206-07). Plaintiff remained classified in Group 1, meaning she suffers from a severe and persistent mental illness, GAF was assessed at 30. (Tr. 208).

At Plaintiff's April 5, 2005 appointment with Dr. Collen, she reported she had broken her arm falling off a ladder, was suffering from several family stressors, and was not sleeping well at all. (Tr. 227-28). Dr. Collen discovered Plaintiff had stopped taking Zyprexa due to weight gain. (Tr. 227). He also noted that she had been receiving Xanax from Dr. Hobbs, her pain specialist, as well as from Dr. Collen. *Id.* He recommended she no longer receive Xanax from Dr. Hobbs. (Tr. 228). She had been directed to taper her Methadone as a condition of probation. (Tr. 227). Dr. Collen also stated that he was unsure if Plaintiff's tearful and pleading manner of relating was

5

attention seeking, drug seeking, or labile affect. *Id*.

Plaintiff saw Dr. Collen on May 3, 2005, complaining of illness, stomach cramps, lack of sleep, and depression as a result of her discontinuing methadone and running out of Xanax. (Tr. 229-30). Dr. Collen recommended Plaintiff follow-up with her primary care physician to taper off Methadone, rather than stopping it on her own, as she had done. (Tr. 229). He recommended she continue to taper her Xanax dosage. *Id*.

Plaintiff continued to see Dr. Collen until August 30, 2005. (Tr. 231-38). On October 3, 2005, she saw Dr. David Chang at MHC. (Tr. 239-40). Dr. Chang described Plaintiff as appearing mildly intoxicated, and Plaintiff admitted to drinking "a beer." (Tr. 239). Dr. Chang stated he had a strong suspicion she has been drinking much more heavily than she admits, and he advised her of the risk of mixing alcohol with her medications. *Id*. On January 30, 2006, Plaintiff was discharged from MHC care due to her incarceration. (Tr. 241).

Plaintiff had an updated CRG assessment on January 16, 2006. (Tr. 203-05). She was assessed as having moderate limitations in activities of daily living; marked limitations in interpersonal functioning; moderate limitations in concentration, task performance, and pace; and marked limitations in adapting to change. (Tr. 203-04). The rater again categorized Plaintiff in Group 1, GAF was assessed at 33. (Tr. 205).

On April 30, 2007, a fourth CRG assessment was performed on Plaintiff. (Tr. 200-02). This assessment seems to have been performed around the time Plaintiff was released from jail. (Tr. 200). Plaintiff was determined to have moderate limitations in activities of daily living; moderate limitations in interpersonal functioning; moderate limitations in concentration, task performance, and pace; and moderate limitations in adaptation to change. (Tr. 200-01). She was

6

again categorized in Group 1, a person with severe and persistent mental illness, and her GAF was assessed at 35. (Tr. 202).

Plaintiff next sought treatment at MHC on May 10, 2007, when she was treated by Dr. Paula Yelverton. (Tr. 242). Dr. Yelverton described Plaintiff as "intoxicated and not rational," with slurred speech and unsteady on her feet. *Id*. Plaintiff insisted on being prescribed Lexapro and Vistaril and rejected Dr. Yelverton's recommendation of medication for mood stabilization. *Id*. Dr. Yelverton opined Plaintiff may be consuming more alcohol than she reported and may be abusing other substances. *Id*. She recommended Plaintiff go to the emergency room for evaluation of need for detox. *Id*. Plaintiff's case manager, who also attended the appointment, also endorsed Dr. Yelverton's recommendation. *Id*. Dr. Yelverton refused to prescribe medication until Plaintiff would be able to rationally discuss the options. *Id*. She ordered a urine drug screen, which was negative. (Tr. 245).

At the request of SSA, Dr. Thomas Pettigrew, a licensed psychologist, performed a psychological evaluation on Plaintiff dated July 23, 2007. (Tr. 248-54). Dr. Pettigrew asked Plaintiff if she had ever used illegal drugs, and she responded that she had experimented when in high school. (Tr. 251). He noted that this is inconsistent with her MHC records. *Id*. He opined that "her thought was linear and organized with no bizarre, unusual, or delusional ideation," and that she "did not report or exhibit signs of hallucinations." (Tr. 252). She exhibited a stable affect, and her memory functions for remote and immediate recall were intact. *Id*. He concluded that she "appeared affectively stable without signs of depression, agitation, mania, or psychosis," but she "may have been inclined to minimize her history of use of alcohol and drugs." (Tr. 253).

George Davis, Ph.D., completed a medical assessment for SSA on August 25, 2007. (Tr.

7

255-68). Dr. Davis concluded Plaintiff had a mild degree of limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 265). Dr. Davis opined that Plaintiff's allegations were not credible in light of the total evidence, as she is only mildly limited in her activities of daily living and social functioning. (Tr. 267). He also believed Plaintiff's main problem to be her alcohol abuse, based on the medical records reflecting her intoxication at appointments. *Id*.

An updated CRG assessment was performed on Plaintiff on March 10, 2008. (Tr. 325-27). She was determined to have moderate limitations in activities of daily living and unable to work; moderate limitations in interpersonal functioning; moderate limitations in concentration, task performance, and pace; and moderate limitations in adaptation to change. (Tr. 200-01). She was again categorized in Group 1, a person with severe and persistent mental illness, and her GAF was assessed at 40. (Tr. 202).

On March 10, 2008, Plaintiff began treatment at Centerstone Community Mental Health Center. (Tr. 328). At her intake interview, Plaintiff stated she had been doing well since she was on her medication. *Id*. Plaintiff indicated she wished to transfer medical providers from MHC to Centerstone because she had a very bad history with her previous provider. (Tr. 334). Plaintiff reported extreme irritability and mood swings, major depressive and manic episodes, and visual hallucinations. *Id*. Plaintiff stated that her current medications, Seroquil, Celexa, and Vistiril worked very well for her. (Tr. 335).

At a follow-up visit on May 12, 2008, Plaintiff was described as "markedly improved." (Tr. 347). At her next appointment, on July 7, 2008, her provider's notes reflected Plaintiff's status was "continually improved." (Tr. 356). The same remark was made on Plaintiff's visit

8

dated August 25, 2008. (Tr. 371). Plaintiff denied alcohol or drug use. *Id*. Plaintiff's status continued to improve at her November 3, 2008 and December 29, 2008 appointments. (Tr. 378, 79).

On July 28, 2008, an updated CRG was prepared for Plaintiff. (Tr. 322-24). Plaintiff was determined to have moderate limitations in activities of daily living, including a notation she is unable to work; moderate limitations in interpersonal functioning; moderate limitations in concentration, task performance, and pace; and moderate limitations in adaptation to change. (Tr. 322-23). She was again categorized in Group 1, a person with severe and persistent mental illness, and her GAF was assessed at 40. (Tr. 324).

Plaintiff went to the emergency room at Centennial at Ashland City on September 21, 2008, as she had stated she wanted to blow her head off. (Tr. 280). She was described by the provider, Dr. Lundy, as intoxicated. *Id*. A urine drug screen was performed, the results of which were negative. (Tr. 287).

Plaintiff was again treated in the emergency room at Centennial at Ashland City on January 21, 2009. (Tr. 270-78). Plaintiff's boyfriend called 911 and reported Plaintiff was suicidal and had threatened to stab herself. (Tr. 270-71). Hospital records also reflect Plaintiff was not taking her medications correctly and had consumed an unknown amount of whiskey. (Tr. 271). Plaintiff denied she was suicidal and was released. *Id*. A urine drug screen conducted at the hospital was negative. (Tr. 278).

Plaintiff was seen at Hayes Child and Adolescent Center on February 23, 2009. Plaintiff was described as "stable on current meds." (Tr. 466). She "spends [her] days being active with cleaning, gardening and taking care of mother." *Id*. The provider, Alicia Batson, noted that

9

Plaintiff had been hospitalized three months prior for depression and non-compliance in taking her medication as prescribed. *Id*. At a follow-up appointment on June 8, 2009, the provider, Elizabeth Swope, stated that Plaintiff reported the medication was very helpful. (Tr. 476).

Plaintiff completed a Function Report indicating she watches television, cleans house, washes dishes, waters plants, feeds animals, and spends time with her mother, daughter, and friends. (Tr. 149-50). She also cares for her personal needs but sometimes needs help remembering to take her medication. (Tr. 150-51). She shops for and prepares her meals. (Tr. 151-52). She does not drive because she does not own a car. (Tr. 152). Plaintiff stated that she does not like to be around people and was fired from her previous job for arguing with her boss and coworkers. (Tr. 154-55).

Thelma Osborne, a friend of Plaintiff's family, completed Plaintiff's request for reconsideration. (Tr. 165-72). Ms. Osborne stated that Plaintiff's mental problems are a result of her childhood, when her father murdered her uncle and high school friend in the house Plaintiff currently lives in. (Tr. 171). Ms. Osborne indicated that she filled out the paperwork for Plaintiff because Plaintiff was unable to sit still or concentrate long enough to do so. (Tr. 171-72).

Plaintiff's case manager at Mental Health Cooperative, Jan Carlin, also completed a request for reconsideration on Plaintiff's behalf. (Tr. 174-82). Ms. Carlin stated she had known Plaintiff for approximately eight and one-half months at the time she completed the form. (Tr. 180). She described Plaintiff's demeanor as mixed and her thinking as "slightly off." *Id.* She stated that Plaintiff has a history of violent and physically abusive relationships, has been raped multiple times, and relies on her mother to manage her affairs. (Tr. 180-81). Ms. Carlin concluded that "[e]mployment would be out of the question due to instability, flight of ideas,

10

tangential thinking, erratic behavior and moods, adolescent reasoning ability, and failure to communicate or understand reasonable boundaries." (Tr. 181).

At the hearing before the ALJ, Dr. Rebecca Sweeney testified as a medical expert. Dr. Sweeney opined that Plaintiff has an affective disorder, an anxiety disorder, and substance abuse, which do not meet or equal any of the listings in the code. (Tr. 29). She testified that Plaintiff's limitations in areas of activities of daily living, social interaction, concentration, persistence and pace, and decompensation were moderate, although the limitations might be mild with regard to activities of daily living and marked with regard to working with the public. *Id*. Dr. Sweeney stated Plaintiff could follow three-step instructions but should avoid contact with the general public. (Tr. 29-30). Plaintiff could generally interact with coworkers, and she could have infrequent changes in the workplace. (Tr. 30). According to Dr. Sweeney, Plaintiff's mood disorder gets worse when she is using alcohol. (Tr. 32). With regard to the CRG/GAF ratings given to Plaintiff, Dr. Sweeney noted that a level of 40 would indicate a rather severe problem, but Plaintiff's CRGs were improving every year from 2004 to 2007. (Tr. 33).

At the ALJ hearing, Plaintiff testified that she consumes alcohol approximately once every two weeks. (Tr. 39). She had three beers out of a six-pack the day before the hearing and stated she never has more than a six-pack when she drinks. *Id*. She no longer uses street drugs, and she takes her medication as prescribed. (Tr. 39-40). Plaintiff did not know what to say when asked why she believes she is disabled. (Tr. 40-41). She testified she spends her average day gardening, cleaning, and helping her mother. (Tr. 41). Plaintiff takes Seroquel, Zestril, and Celexa for her depression, which seems to help her symptoms. (Tr. 43). She has panic attacks from two to five times per week. (Tr. 44). Plaintiff testified she has trouble dealing with people,

11

which has caused her to quit or be fired from previous jobs. (Tr. 44-45).

Vocational Expert Jane Brenton also testified at Plaintiff's hearing. (Tr. 46). The ALJ asked Ms. Brenton what kind of work an individual Plaintiff's age could perform, if she had a high school education and Plaintiff's work history, could perform work at all exertional ranges, but could only maintain concentration and persistence necessary to perform simple three-step tasks, could not have contact with the general public, can relate to co-workers on at least an occasional basis, might require occasional direct supervision, and could adapt to infrequent changes in the workplace. (Tr. 47-48). Ms. Brenton stated that there would be work at the medium light and light and sedentary level. (Tr. 48). The ALJ then requested Ms. Brenton identify those jobs, and she identified three medium level jobs and asked the ALJ whether he wanted her to identify light work jobs, as well. *Id*. The ALJ next asked whether the hypothetical individual he had described could perform the job identified. Ms. Brenton stated she would interact with the public, though not on a face-to-face basis, and she did not "believe that that would meet [the ALJ's] hypothetical." *Id*.

Plaintiff's attorney[2] asked Ms. Brenton whether, if the ALJ found Plaintiff's testimony credible, there would be any jobs available. (Tr. 49). Ms. Brenton answered there would be none, because she indicates she has difficulty stying on task, dealing with people, and is unable to drive. *Id*.

## II. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff cites five alleged errors committed by the ALJ for review. First, the ALJ erred by determining Plaintiff's substance abuse disorder was a severe impairment without first

---

[2] At her hearing, Plaintiff was represented by Mark Fraley.

determining whether the affective disorder and anxiety disorder were severe impairments and disabling without the substance abuse. Second, the ALJ erred by not addressing whether the Plaintiff's severe mental conditions would exist and be disabling, even with substance abuse. Third, the ALJ failed to follow medical examiner testimony which proves that the Plaintiff is disabled. Fourth, the ALJ failed to properly follow the testimony of the vocational expert. Fifth, the ALJ failed to properly evaluate and assess the credibility of Plaintiff's statements. These errors are addressed below.

A.     Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6thCir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

13

B.  Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1. If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2. If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3. If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4. If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5. Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C.      The ALJ Properly Evaluated Plaintiff's Substance Abuse

Plaintiff's first two statements of error are essentially the same. Plaintiff contends that her anxiety and bipolar disorders should have been considered disabling in the absence of any substance abuse. When a claimant alleges disabling mental impairment, an ALJ is required to evaluate first whether the claimant has a "medically determinable mental impairment" and then to rate the "degree of functional limitation resulting from the impairment." 20 C.F.R. § 404.1520a. The ALJ must evaluate the so-called "A" criteria, consisting of the "symptoms, signs, and laboratory findings" of the claimant's alleged medically determinable mental impairment. *Id.* The ALJ must also evaluate the "B" criteria, which rate the claimant's degree of functional limitation and consist of four functional areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* The ALJ's application of these criteria must be documented in his decision. *Id.*

Here, the ALJ appropriately described his evaluation of both the "A" and "B" criteria. The ALJ noted that Plaintiff had been hospitalized more than once for possible suicidal ideation and had been treated for bipolar disorder and panic disorder, among other illnesses. (Tr. 16). The ALJ also noted that Plaintiff had been given GAF scores of 30 to 52, with the most recent being 40. (Tr. 16-20). A GAF score below 50 "indicates a serious impairment in social or occupational functioning." (Tr. 20). As the ALJ properly stated, however, GAF ratings "must be considered in the context of the record as a whole to obtain a longitudinal picture of the overall degree of functional limitation." *Id.* The ALJ was persuaded that Plaintiff's illness was not disabling

15

because her mood stabilized with medications and treatment. *Id*. Plaintiff was also able to adequately perform activities of daily living, including helping her mother and visiting with friends on occasion. *Id*. The Magistrate Judge therefore believes the ALJ had substantial evidence for his residual functional capacity findings.

D.     The ALJ Properly Followed Medical Examiner Testimony

Plaintiff assigns error to the ALJ's findings with regard to Dr. Sweeney's testimony regarding Plaintiff's substance abuse and GAF scores. Dr. Sweeney testified that substance abuse was material with regard to Plaintiff's mood disorder, but not her anxiety disorder. (Tr. 32). This argument is similar to the previous arguments; Plaintiff is essentially arguing that the ALJ should have considered her anxiety disorder without regard to her substance abuse. As explained above, the ALJ properly evaluated Plaintiff's illness and found that her impairments did not meet or equal the criteria of the listed impairments, either singly or in combination. The ALJ correctly noted that Plaintiff's condition improved with treatment and medication, consistent with Plaintiff's own testimony.

In addition, as noted above, GAF scores are not determinative of disability. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 503 n. 7 (6th Cir. 2006) ("A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning."). The ALJ properly evaluated Plaintiff's residual functional capacity here; he considered the GAF scores she had been assigned and properly explained why he gave greater weight to other evidence in the record, including Plaintiff's daily activities and improvement with medication and therapy. Therefore, the

Magistrate Judge believes the ALJ's decision on this point was not error.

E.  The ALJ Properly Followed the Vocational Expert's Testimony

Plaintiff argues that the ALJ failed to follow Ms. Brenton's testimony. There is some lack of clarity in Ms. Brenton's testimony. Ms. Brenton first identified the only past relevant work experience Plaintiff had, that of telephone solicitor. (Tr. 47). The ALJ the posed a hypothetical to Ms. Brenton, which shared the same residual functional capacity he assigned to Plaintiff. The hypothetical included an instruction that the individual should have no contact with the general public. (Tr. 48). Ms. Brenton identified three medium light jobs that would be appropriate for the hypothetical individual - packer, machine feeder, and housekeeper. At this point, the ALJ asked Ms. Brenton, "I guess I should ask you could such a hypothetical individual perform the job that you identified?" *Id*. Ms. Brenton replied, "Well she would have – she would interact with the public, although it would not be on a face-to-face basis and I don't believe that that would meet your hypothetical." *Id*.

Plaintiff contends that this exchange is referring to the three medium light jobs identified by Ms. Brenton, and that Plaintiff would have to interact with the public in those positions, making them unsuitable for her residual functional capacity. The Commissioner interprets the exchange as referring to Plaintiff's past work experience as a telephone solicitor. The Magistrate Judge believes the Commissioner's interpretation is more reasonable. Ms. Brenton referred to a single job and noted that Plaintiff would have to interact with the public, but not on a face-to-face basis. It seems unlikely that any of the three medium-light jobs identified would require interaction with the public in this way, but telephone solicitation certainly would. Moreover, Plaintiff's attorney apparently saw no need to clarify this statement on his cross-examination of

17

Ms. Brenton, suggesting this statement was consistent with Ms. Brenton's testimony as a whole, that the hypothetical individual could perform medium-light and light-duty jobs.

F.  The ALJ Properly Evaluated Plaintiff's Credibility

The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not credible," based on her level of independent functioning and the record as a whole. (Tr. 21). An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Further, discounting the credibility of a claimant is appropriate where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id*. Like any other factual finding, however, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003). Here, Plaintiff's condition clearly improved with medication and treatment, and she was able to live alone and was independent in her personal needs. Dr. Pettigrew noted Plaintiff was able to understand, remember, and carry out simple verbal instructions, and she "appeared calm and composed" during the examination. (Tr. 253). The Magistrate Judge therefore believes the ALJ had sufficient evidence for discounting the credibility of Plaintiff's statements.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment be **DENIED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in

which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 22nd day of November, 2010.

/S/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge